**Martha Ellen BRENNAN, Plaintiff–Appellant,**

v.

**METROPOLITAN OPERA ASSOCIA-TION, INC., David Kneuss, Joseph Volpe, Defendants–Appellees.**

**Docket No. 98–7749**

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1998.

Decided Sept. 21, 1999.

Renee L. Cyr, New York, NY, for Plaintiff–Appellant

Neil H. Abramson, New York, N.Y. (Proskauer Rose LLP, New York, NY, Henry W. Lauterstein, General Counsel, Metropolitan Opera Association, New York, NY, of counsel), for Defendants–Appellees.

Before: JON O. NEWMAN, PARKER, Circuit Judges, and PATTERSON, District Judge *.

PARKER, Circuit Judge:

Plaintiff-appellant Martha Ellen Brennan appeals from a final judgment of the United States District Court for the Southern District of New York (Michael B. Mukasey, *Judge* ) entered April 24, 1998, granting summary judgment for the Metropolitan Opera Association, Inc. (the "Metropolitan Opera" or the "Met"), David Kneuss, Executive Stage Director at the Met and Joseph Volpe, the Met's General Manager (collectively "defendants" or "appellees") and declining to exercise jurisdiction over one of the plaintiff's supplemental state law claims.

Appellant sued her employer alleging that she had been discharged from her job as an Assistant Stage Director with the Met because of her age, gender, and sexual orientation. She also contends that she was subjected to a hostile work environment based on her age, gender, and sexual orientation. The district court found that Brennan presented insufficient evidence to raise a triable issue of fact as to any of her claims. We agree.

---

* The Honorable Robert P. Patterson, Jr. of the United States District Court for the Southern District of New York, sitting by designation.

## I.  BACKGROUND

### A.  *Brennan's Employment With the Met*

Brennan began working for the Met in 1986 as an "observer," a volunteer position. She continued to work as a volunteer in various capacities until late spring 1987, when she accepted a part-time paid position as secretary to Phebe Berkowitz, Executive Stage Director, for the 1987–88 season. On the employment verification form Brennan completed in August 1987, she misrepresented her birth date as December 30, 1956. Brennan's actual birth date is December 30, 1946.

Brennan returned as Berkowitz's Administrative Assistant for the 1988–89 season, with the understanding that Berkowitz would be going on maternity leave and Brennan would then be working with Berkowitz's temporary replacement, David Kneuss. Brennan describes Kneuss's attitude toward her at this time as "charming" and "gregarious."

When first working for Berkowitz, Brennan spoke with her about Brennan's goal to become an Assistant Stage Director. An Assistant Stage Director aids the Stage Director in coordinating rehearsal schedules, organizing and preparing the rehearsal room, acting as liaison to other departments, preparing the production book, doing background research and preparing and rehearsing understudies ("covers") and replacements. Berkowitz suggested to Brennan that she needed to get some experience in smaller opera houses and improve her language skills. To this end, Brennan resigned in March 1989 to become an Assistant Stage Director at the Houston Grand Opera. During the next year she also worked at the Opera Theater of St. Louis and the Struthers Library Theater in Pennsylvania as well as spending three months in Germany studying the language.

In April 1990, Kneuss, who had become Executive Stage Director when Berkowitz stepped down after returning from maternity leave in spring 1989, offered Brennan a position as an Assistant Stage Director at the Met for the 1990–91 revival of *Der Rosenkavalier*. Brennan accepted the offer and entered into a "Standard Principal's Contract (Weekly)." All Assistant Stage Directors entered into this type of contract which constituted an employment agreement for one season. During the season, usually in mid-February, the Met sent all Assistant Stage Directors a letter indicating whether there would be work for them the following season ("ABC letter").

During the 1990–91 season Brennan worked with Bruce Donnell, Stage Director for *Der Rosenkavalier*. She had minimal contact with Kneuss, but she felt that he was not as friendly to her as he had been in the past. In February 1991, Brennan received an ABC letter informing her that she would not be rehired for the 1991–92 season. However, Kneuss later contacted her and offered her a position as Assistant Stage Director for *The Magic Flute*, which he was directing in the 1991–92 season. Brennan accepted the position.

During her 1991–92 work on *The Magic Flute*, Brennan conducted rehearsals for the first time. She remembers only one occasion on which Kneuss criticized her work, telling her that she needed to be better about getting rehearsals started on time. Brennan characterized Kneuss's treatment of her during this season as "hostile, degrading, and demeaning." She could not recall specific remarks, but thought his tone of voice and his facial expressions were intended to demean her. Brennan and Rosemarie White, Kneuss's secretary, thought Kneuss, who was born in 1948, treated Brennan, Paul Mills, Sharon Thomas, Pamela McRae and Lesley Koenig more harshly than other Stage Directors and Assistant Stage Directors. Thomas, Mills and McRae were all over 40, as was Brennan.

In February 1992, Brennan received an ABC letter informing her of the Met's intention to rehire her for the 1992–93 season. Kneuss asked her to be the Assistant Stage Director for *The Magic Flute* and *Der Rosenkavalier*. Brennan found working for Kneuss during the 1992–93 season "depressing and demoralizing." She thought he spoke to her scornfully and derisively. He was rude to her several times in the presence of other people, undermining her authority. She remembers three incidents in particular. First, he was very curt in answering her questions in front of a Stage Manager, and told her "you may go." Second, one day in the cafeteria when Brennan introduced Kneuss to Christian Thielemann, a new conductor, in the presence of Irene Spiegelmann, a diction coach, Kneuss said to Thielemann, after giving Brennan a "nasty" look, "Stick with Irene." Finally, when asked a question by Brennan, Kneuss rolled his eyes at Gil Wechsler, a lighting designer.

At a meeting in early 1993, Kneuss told Brennan that he expected Assistant Stage Directors to grow into the role of Stage Director. Brennan thought this was a change in policy and responded by telling Kneuss that she did not know if she wanted to direct. According to Brennan, Kneuss had never met with her to critique her performance, when in February 1993 she received an ABC letter informing her that the Met would not be offering her a contract for the 1993–94 season. When Brennan approached Kneuss about the letter, he told her that he felt she lacked energy and did not bring life to the stage or propel performances forward. At the end of March 1993, Brennan asked Kneuss once again to reconsider, but he refused, recounting his feelings about her performance and adding that she was getting expensive, especially if she did not wish to grow towards directing. In addition, he told Brennan that he felt she did not "fit in." Brennan called Kneuss one more time in March; he persisted in his determination not to rehire her.

After this last discussion with Kneuss, Brennan called Alan Olsen at the American Guild of Musical Artists, Inc., the union with which the Met contracted, to complain about not being rehired. In late March 1993, Brennan met with Charles Reicker, Coordinator for Artistic Relations at the Met, and read him a document she had written called "David Kneuss treatment of some stage directors." The document criticized Kneuss's management style, but did not mention any claims relating to age, sex, or sexual orientation discrimination. Reicker set up a meeting for Brennan with Pamela Rasp, the Met's Director of Labor Relations. When she met with Rasp in March or April 1993, Brennan reiterated her complaints.

Kneuss hired Robin Guarino as Assistant Stage Director for the 1993–94 season for *The Magic Flute* and *Der Rosenkavalier*. Guarino, who was then 33, had worked at the Met during the 1992–93 season. In April 1994, Kneuss wrote about Guarino that she had done remarkably well as an Assistant Stage Director, but he was unsure whether she would ever be prepared to direct at the Met. Guarino was rehired for the 1994–95, 1995–96, 1996–97 and 1997–98 seasons. She received her first directing credit during the 1996–97 season.

B. *Evidence of a Sex-based Hostile Work Environment*

When Brennan first worked at the Met as an Assistant Stage Director during the 1990–91 season, she shared an office, Room C–5, with several other Assistant Stage Directors. During 1991, one of Brennan's co-workers, Stephen Pickover, placed pictures of semi-clothed and nude men on one of the three bulletin boards in the office. There were seven post-card sized pictures which took up about one-quarter of the bulletin board. On five of the pictures the models were wearing shorts or bathing suits. On one picture the model was draped in a sheet. Two of these pictures were cropped so that the head of each subject was removed from the picture, thereby making the torso of each individual the focus of the picture. The last picture depicted four nude men standing in a semi-circle on a beach. Brennan was offended by the pictures and removed them from the bulletin board on December 28, 1992. When she gave them to Pickover she complained to him about their being on the bulletin board. Pickover said nothing in response, he simply put the pictures back up.

Catherine Hazelhurst and Robin Guarino, who shared the office, were in the room at the time and both told Pickover that they did not like the pictures either. Rosemarie White, Kneuss's secretary, told Kneuss twice that there had been complaints about the pictures. The first time White informed Kneuss of the situation he stated that everyone in that office was an adult and they could work it out among themselves. When White brought the topic up a second time Kneuss impatiently brushed it aside. At no time did Kneuss discuss the pictures with anyone working in C–5 and the pictures remained on the bulletin board throughout Brennan's employment with the Met. Brennan never complained to Kneuss or any other supervisor about the pictures.

Brennan also recalled one incident of "lewd banter" between Kneuss and another male employee. According to Brennan, she was in the auditorium with Kneuss waiting for a rehearsal to begin when the Artistic Director at the Met arrived and began to make comments of a sexual nature to Kneuss. Brennan was seated on the aisle between the two men who were standing in the aisle close to her. The remarks were not directed at Brennan, who put her fingers in her ears as soon as she realized the sexual nature of the conversation. Brennan took her fingers out of her ears in time to overhear the Artistic Director say to Kneuss, "do you want to do it now?" and to see him "point at his crotch."

### C. Proceedings Below

Brennan's last day at the Met was April 16, 1993. She timely filed a complaint with the New York State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC") in April 1993, alleging discrimination on the basis of age, sex, and sexual orientation. The EEOC issued a Right to Sue Letter dated January 27, 1995. Brennan filed a complaint in federal district court on April 26, 1995 alleging violations of the Age Discrimination in Employment Act 29 U.S.C. § 621 *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, New York Executive Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, Administrative Code and Charter of the City of New York § 8–101 *et seq.* ("NYCHRL"). The complaint states that the defendants discriminated against Brennan based on her age, sex, and sexual orientation by refusing to rehire her for the 1993–94 season and by subjecting her to a hostile work environment based on those protected characteristics. She sought damages and injunctive relief which would, *inter alia,* reinstate her as an Assistant Stage Director at the Met.

On April 2, 1997, the defendants moved for summary judgment pursuant to Fed. R.Civ.P. 56(c). By Opinion and Order dated April 20, 1998, the district court granted the defendants' motion. *See Brennan v. Metropolitan Opera Association, Inc.,* No. 95 CIV 2926, 1998 WL 193204 (S.D.N.Y. Apr. 22, 1998). Having dismissed the plaintiff's claims of age and sex discrimination arising under both federal and state law, the court declined to exercise supplemental jurisdiction over her claim alleging sexual orientation discrimination in violation of New York City's Hu-

man Rights Law. Brennan timely filed a Notice of Appeal.

## II. DISCUSSION

On appeal, Brennan disputes the district court's dismissal of her age discrimination claim and her hostile work environment claims relating to both age and sex. She does not appeal the district court's dismissal of her claim that she was not rehired by the Met because of her gender. Nor does she appeal the district court's refusal to exercise supplemental jurisdiction over her sexual orientation discrimination claim. This Court reviews a district court's grant of summary judgment *de novo. Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764 (2d Cir.1998). We consider the evidence in the light most favorable to the appellant, drawing all reasonable inferences in her favor. Summary judgment is appropriate only in the absence of a genuine issue of material fact. *Id.* at 764–65.

### A. Age Discrimination

■■■ The same standards govern disparate treatment claims arising under either Title VII or the ADEA. *See Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998).[2] First, the plaintiff must prove a prima facie case of discrimination as originally outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), by showing: (1) that she was a member of a protected class, (2) that she was qualified for the position, (3) that she experienced an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *Viola v. Medical Systems of North America,* 42 F.3d 712, 716 (2d Cir.1994). Once the plaintiff has met this *de minimis* burden, *Chambers v. TRM*

---

2. Employment discrimination claims brought under the NYSHRL are analyzed identically to claims under the ADEA and Title VII. *See Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264 n. 1 (2d Cir.1999). Accordingly, in this case, the outcome of the age and sex discrimination claims and age and sex based hostile work environment claims are the same whether they are predicated on federal law or New York State law and we will thus not address the plaintiff's NYSHRL claims separately.

*Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994), the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer meets its burden of production, the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination. *Id.* at 507–08, 113 S.Ct. 2742.

In this case, the district court held that the plaintiff did not establish a prima facie case of age discrimination because she failed to present sufficient evidence from which the requisite inference of discrimination could be drawn. First, the court disagreed with Brennan's argument that she had raised an inference of age discrimination by showing that she was replaced by a younger person, Robin Guarino. The court thought it doubtful that Guarino could really be said to have replaced Brennan, because Assistant Stage Directors were seasonal employees with no automatic continuation of employment from season to season. The court did not base its holding on this observation, however, finding that even if Guarino did replace Brennan there was no evidence of age discrimination because there was no evidence that Kneuss knew Brennan's age relative to Robin Guarino's age.

On appeal the plaintiff argues that in light of the Supreme Court's holding in *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), she need only show that she was replaced by a person substantially younger than she is in order to establish a prima facie case of age discrimination. In *O'Connor* the Supreme Court held that a plaintiff does not have to show that his replacement was not within the protected class, i.e. 40 or over, to establish a prima facie case of age discrimination. The Court noted that the fact that the replacement is substantially younger than the plaintiff is a more valuable indicator of age discrimination, than whether or not the replacement was over 40 at the time he assumed the plaintiff's former job responsibilities. *Id.* at 313, 116 S.Ct. 1307.

■ To the extent that Brennan is arguing that Kneuss did not need to know her exact age, but only that she was substantially older than Guarino, *O'Connor* does support her position. Indeed, assuming the 33–year–old Guarino did replace the 47–year–old Brennan, appellant may well have met her *de minimis* burden of establishing a prima facie case of age discrimination. We need not decide the issue, however, because even if appellant succeeded at the prima facie case stage summary judgment was still properly granted.

■ Appellee met its burden of production to proffer a legitimate non-discriminatory reason for not offering Brennan work for the 1993–94 season, i.e., her performance was inadequate. Brennan must therefore present evidence from which a fact-finder could reasonably conclude that the Met's reason was pretextual and that the real reason was discrimination. *Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742. The ADEA encompasses situations in which an employer considers age. *O'Connor,* 517 U.S. at 312, 116 S.Ct. 1307. There is no evidence in this record that Kneuss considered Brennan's age, Guarino's age, or their ages relative to each other, when he chose to ask Guarino to be Assistant Stage Director on two operas for which Brennan had held that position for the preceding several years. Kneuss testified in his deposition that he thought both Guarino and Brennan were in their thirties at the time he made his decision not to ask Brennan to return. There is no evidence to counter this testimony; Brennan never told Kneuss her age and even falsified her age on her employment verification form, making it appear that she is ten years younger than she is.

Because there is no evidence that Kneuss intentionally discriminated against Brennan because of her age summary judgment was properly granted.

B. *Hostile Working Environment—Legal Standards*

■ Title VII creates a cause of action based on the presence of a hostile working environment when the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment...." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citation and internal quotations omitted). The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII. *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir.1996).

■ A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it. *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir.1998). A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class. In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes. *Cf. Oncale v. Sundowner Offshore Services, Inc., et al.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998)(the critical issue is whether one sex is subject to more disadvantageous conditions than the other).

■ Isolated, minor acts or occasional episodes do not warrant relief. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992). A plaintiff need not present a list of specific acts. *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.1997)(allegations of constant harassment confirmed by co-workers sufficient to create a triable issue of fact even where the plaintiff did not remember details of every incident). However, a plaintiff must still prove that the incidents were "sufficiently continuous and concerted" to be considered pervasive, *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997), or that a single episode is "severe enough" to establish a hostile working environment. *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 437 (2d Cir.1999) (quoting *Torres*, 116 F.3d at 631 n. 4).

1. *Age-based Hostile Working Environment*

■ The district court held that no triable issue of fact existed as to the existence of an age-based hostile working environment because there is no evidence that Kneuss knew Brennan's age, and because the three instances of hostility recounted by Brennan had nothing to do with age and were, in any event, insufficient as a matter of law to demonstrate a hostile work environment.

We agree with the district court that the record is devoid of evidence that the three incidents Brennan points to reflect any age-based animus. Brennan herself attributed Kneuss's "rude" behavior to the generally harsh atmosphere of the Met, a tone she claimed was set by Joseph Volpe as general manager. There is nothing from which a jury could find that Brennan was subject to a hostile working environment based on her age.

2. *Sex-based Hostile Working Environment*

■ The district court also held that the plaintiff failed to raise a triable issue of fact as to the existence of a sex-based hostile work environment. Brennan proffered three pieces of evidence. First, she relied on Kneuss's general "rude" behavior. This evidence is quickly dealt with since there is no indication that Kneuss treated women more harshly than men. In fact, at her deposition Brennan identi-

fied five men whom she thought Kneuss treated unfairly.

As to her second piece of evidence, Brennan recalled the "lewd banter" involving Kneuss recounted above, *see supra* part IB. Brennan does not mention this incident on appeal. In any event, one episode of this type over three years does not, by itself, establish a pervasively hostile atmosphere. *See Kotcher*, 957 F.2d at 62 ("occasional events" insufficient to demonstrate a hostile work environment).

The only other evidence of sexual harassment, which is Brennan's primary focus on appeal, are the sexually provocative pictures of nude and partially clothed men that a male co-worker put up in their shared office. The district court noted that it is unreasonable to assume that such pictures would be offensive only to women. Because Brennan did not present evidence to support her claim that these pictures were more offensive to women, the court concluded that she could not prove she had been subjected to a hostile working environment based on her sex. We do not reach this issue.

Instead, we affirm the district court's alternate holding that no juror could rationally find that these pictures created a pervasive atmosphere of "intimidation, ridicule and insult" adequate to alter the terms of the plaintiff's employment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Whether a work environment is sufficiently abusive to be actionable under Title VII depends on all of the circumstances of a given situation. Considerations include: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

Considered in the light most favorable to Brennan, the frequency of the conduct in the present case supports her claim. The pictures were located in the office she shared with other Assistant Stage Directors. She was thus exposed to them every working day. In contrast, the severity of the objectionable conduct tells against Brennan's claim. Although the pictures were displayed throughout her tenure at the Met, they, along with the one instance of sexual banter, constitute the only evidence of a hostile work environment. Similarly, while arguably offensive, the pictures and banter could not reasonably be characterized as physically threatening or humiliating. As for the fourth consideration, Brennan presents no evidence that she was hampered in her job by these pictures or the one incident of sexual banter. The fact that Brennan complained to the owner of the pictures and to Kneuss's secretary that she found the pictures offensive does not constitute evidence that the pictures were negatively affecting her work performance. Nor does Kneuss's failure to act on the complaints he received via his secretary sufficiently magnify the severity of the situation to create a triable issue of fact.

Under the circumstances of this case, a jury could not reasonably find the existence of a severe, pervasive atmosphere of sex-based hostility at the Met. These pictures and the one instance of sexual banter alleged by the plaintiff, while they were arguably inappropriate in a work setting, do not rise to the level of actionable conduct. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662 (1998)(citing *Oncale*, 118 S.Ct. at 1002 for the proposition that the standards under Title VII for judging the existence of a hostile work environment are sufficiently stringent not to enable the statute to become a " 'general civility code' ").

### III. Conclusion

The district court correctly granted summary judgment for the defendants on the age discrimination claim as well as the

claims alleging a hostile working environment based on both age and sex. Accordingly, the judgment of the district court is AFFIRMED.

JON O. NEWMAN, Circuit Judge, concurring in part and dissenting in part:

Though I agree with the majority's rejection of the plaintiff's age discrimination claim, I respectfully dissent from the majority's refusal to permit a jury to decide whether the prolonged display on an office bulletin-board of photos of nude and partially clothed men constitutes a hostile work environment entitling a female employee to claim gender discrimination in violation of Title VII. In my view, this is precisely the sort of issue on which the sense of the community, as expressed by a jury, should be brought to bear.

The key facts are largely undisputed. Martha Brennan shared an office at the Metropolitan Opera with several other employees, including Stephen Pickover. A bulletin board was located above Pickover's desk, very close to Brennan's desk. In 1991, Pickover placed on the bulletin board seven photos, the size of postcards. All depict nude or partially clothed men. One photo shows a circle of nude men frolicking on a beach with arms interlocked; the precise nature of their activity is not clear. The genitals of two of the men are plainly visible. In two other photos, the men's heads had been cropped, and the evident focus of the photos is the men's genital areas, covered by scanty, tight-fitting bathing suits, which render the genital areas prominent. Brennan removed the photos in 1992 and placed them on a shelf above Pickover's desk, expressing her complaint about their display. He put the photos back up on the bulletin board. According to Brennan, two other female employees also complained to Pickover about the photos. The secretary to David Kneuss, the Executive Stage Director of the Met, twice told him of complaints about the photos by female employees. He took no action. The photos remained on display during Brennan's employment, which ended in 1993.

These facts present two issues: (1) can the display of the photos reasonably be found to discriminate against women on the basis of gender, and (2) can the display of the photos reasonably be found to constitute a gender-based hostile work environment. The majority declines to decide the first issue and rules adversely to Brennan on the second issue.

1. *Gender-based discrimination.* In Title VII cases, the usual standard is stated to be " 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring)). That formulation makes sense where a member of a protected class complains of discrimination with respect to wages or vacation days. But commonality of exposure cannot be permitted to defeat *all* claims of gender discrimination. Displays of photos of Blacks being lynched or of nude women in sexually provocative poses would not be insulated from Title VII claims simply because the photos were observable by all office employees, White and Black, male and female.

Whether such displays can be found to constitute discrimination turns in large part on the perspective from which the offensive nature of the displays are assessed. The choice is between the perspective of a reasonable person or that of a reasonable member of the protected class. Our Court has used language supporting both alternatives. In *Torres v. Pisano,* 116 F.3d 625 (2d Cir.1997), we pointedly noted that a reasonable "woman" would have found the work environment hostile, and we cited decisions in several circuits stating that the relevant perspective is that of a member of the protected class.

*See id.* at 632–33 & n. 6 (collecting cases).[1] However, in *Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426 (2d Cir.1999), we stated, albeit in a footnote, that "we reject the view of those courts that look to the perspective of the particular ethnic or gender group . . .," preferring instead the perspective of a "reasonable person who is the target of racially or ethnically oriented remarks." *Id.* at 436 n. 3. In *Oncale,* the Supreme Court advised that the harassment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" 523 U.S. at 81, 118 S.Ct. 998 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367 (Ginsburg, J., concurring)), but this formulation leaves the matter unresolved because the reference to "the plaintiff's position" could mean either only the circumstances to which the plaintiff was exposed or those circumstances plus the plaintiff's own race or gender. The Court's next sentence, requiring "careful consideration of the social context in which particular behavior occurs *and is experienced by its target,*" *id.* at 81, 118 S.Ct. 998 (emphasis added), tilts toward the latter meaning.

Though it is possible to articulate the concept of a reasonable person, without regard to racial or gender characteristics, it will require considerable mental agility for most fact-finders to apply such a concept in assessing hostile work environment claims. Is the construct that of a reasonable person lacking racial or gender characteristics or only a reasonable person who assesses the circumstances without regard to the person's own race or gender? Moreover, there is a risk that a reasonable "person" test, however appropriate for issues like negligence, will permit the perspective of the majority to carry the day as to race and gender issues; the majority of

Whites might well not be aware that certain remarks or displays are offensive to most Blacks, and the majority of men might well be just as insensitive to certain remarks or displays that most women consider offensive. The perspective of the reasonable "person" might turn out to be the very stereotypical views that Title VII is designed to outlaw in the workplace.[2] If a reasonable "person" perspective is to be used, it would seem essential to permit evidence as to how members of the protected class regard the challenged remarks or displays, so that the construct of the reasonable "person" at least means an informed reasonable person. Even that approach risks allowing claims to be rejected out of indifference, though it avoids, or at least minimizes, the risk that claims will be rejected out of ignorance.

In this case, I need not choose between the reasonable "woman" standard of *Torres* and the reasonable "person" standard of *Richardson,* nor guess at what the Supreme Court meant in *Oncale* by "a reasonable person in the plaintiff's position," because I believe that a jury could reasonably find that a reasonable "person," regardless of gender, would consider the displayed photos more offensive to women than to men. The District Court expressed the view that "it is *most reasonable* to conclude that the sexual objectification of one sex—in this case, male—would be most offensive to members of that sex." *Brennan v. Metropolitan Opera Ass'n, Inc.,* No. 95 Civ. 2926(MBM), 1998 WL 193204, at *14 (S.D.N.Y. Apr.22, 1998) (emphasis added). Whether or not such a conclusion is the "most reasonable" one to be reached (which I very much doubt), it is surely not the only reasonable conclusion that could be reached. If probative evidence persuaded a fact-finder that women

---

1. Ultimately, we affirmed a summary judgment for the employer on the ground that the evidence was insufficient to permit a finding that the employer was liable for the hostile work environment. *See Torres,* 116 F.3d at 633–41.

2. We have noted, however, that "reasonable people can take justifiable offense at comments that the vulgar among us, even if they are a majority, would consider acceptable." *Torres,* 116 F.3d at 633 n. 7.

are more offended than men by continuous displays of male nudity, tinged with sexual overtones, that conclusion would be immune from rejection on appeal. On such matters, Title VII is more faithfully implemented by relying on the finding of a jury that has heard evidence than on the untested assumption of a trial judge ruling on a motion for summary judgment. In this case, the element of gender-based discrimination is satisfied to an extent sufficient to permit a jury to consider the issue.

2. *Hostile work environment.* Though the display of photos may reasonably be found to be more offensive to women than to men, the issue remains whether the degree of offensiveness may reasonably be found to be severe enough to constitute a hostile work environment for purposes of Title VII. The Supreme Court has assured us that "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ..., and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale,* 523 U.S. at 82, 118 S.Ct. 998. I have no doubt that, at the extremes, the continuum from innocent teasing to actionable harassment is subject to decision as a matter of law. A momentary display of photos of nudes, without a hint of sexual activity, could not reasonably be found to constitute a hostile work environment, and a prolonged display of photos of nudes, rife with sexually explicitly activity, could reasonably be found only to constitute a hostile work environment. The display in this case seems to me to fall plainly within the middle area in which the informed judgment of jurors is appropriate. The photos depict a group of nude and partially clothed men cavorting on a beach. A reasonable inference may be drawn that they are assembled for purposes of some sexual activity. The inference is strengthened by the cropped photos displaying only male torsos and emphasizing their genital areas. There is no suggestion that the photos have any connection with artists painting or sculpting live models, and an inference of mere sun-bathing, though possible, is surely not compelled. Moreover, the photos were displayed prominently on an office bulletin board, and the duration of the display exceeded two years, despite complaints from the plaintiff and other female employees. On facts such as these, the "common sense" and "appropriate sensitivity to social context" that the Supreme Court expected to be applied, *see Oncale,* 523 U.S. at 82, 118 S.Ct. 998, should be that of the community, speaking through a representative jury. In *Gallagher v. Delaney,* 139 F.3d 338 (2d Cir.1998), this Court reversed another grant of summary judgment in favor of an employer with respect to a claim of gender-based hostile work environment, and in doing so correctly observed that "a jury made up of a cross-section of our heterogeneous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment...." *Id.* at 342. Because the majority has denied Brennan the opportunity to find out how a jury would assess the facts of this case, I respectfully dissent.