[729 NYS2d 77]

MARTHA E. BRENNAN, Appellant, v METROPOLITAN OPERA
ASSOCIATION, INC., et al., Respondents.

First Department, July 12, 2001

## APPEARANCES OF COUNSEL

*Martha E. Brennan,* appellant *pro se.*

*Neil H. Abramson* of counsel (*Julie F. Sitler* on the brief; *Proskauer Rose, L. L. P.,* attorneys), for respondents.

## OPINION OF THE COURT

ELLERIN, J.

Plaintiff Martha Ellen Brennan claims that, on the basis of her sexual orientation, her former employer, the Metropolitan Opera Association (the Met), her former supervisor at the Met, David Kneuss, and the Met's general manager, Joseph Volpe, refused to renew her contract and subjected her to a hostile work environment, in violation of New York City law. She appeals from an order granting summary judgment to defendants, and we affirm.

Plaintiff's claims are among several causes of action she brought against these defendants in a suit commenced in April 1995 in the United States District Court for the Southern District of New York. Plaintiff alleged that defendants refused to renew her employment contract and subjected her to a hostile work environment because of her age, her sex and her heterosexual orientation, thereby discriminating against her under federal law (42 USC § 2000e-2 [a] [1] [prohibiting discrimination "because of * * * sex"]; 29 USC § 623 [a] [1] [prohibiting discrimination "because of * * * age"]) and state law (Executive Law § 296 [1] [a] [prohibiting discrimination "because of * * * sex"]), as well as New York City municipal law (Administrative Code of City of NY § 8-107 [1] [a] [prohibiting discrimination because of "actual or perceived * * * sexual orientation"]). In a decision affirmed by the United States Court of Appeals for the Second Circuit, the District Court dismissed

plaintiff's age and sex discrimination claims and, in the exercise of its discretion, declined to exercise supplemental jurisdiction over her claims of sexual orientation discrimination under New York City law (*Brennan v Metropolitan Opera Assn.*, 1998 US Dist LEXIS 5562, 1998 WL 193204 [SD NY, Apr. 22, 1998], *affd* 192 F3d 310). Plaintiff then commenced this state Supreme Court action on her sexual orientation discrimination claims.

The IAS court held, as a matter of first impression, that plaintiff is protected, as a heterosexual female, under the New York City law against employment discrimination based on sexual orientation. As the court explained, "The fact that discrimination against heterosexuals is not as pervasive as that found against homosexuals does not change the clear wording of the municipal law nor does it lessen the impact of such prejudices on the individuals involved." However, the court granted defendants' motion for summary judgment dismissing the complaint upon its finding that plaintiff's evidence failed to establish that defendants refused to renew her contract because of her sexual orientation or created a hostile work environment. Our exhaustive review of the record compels us to the same conclusion.

The basic facts are as follows. Plaintiff, a heterosexual female, began working for the Met as secretary to PB, the executive stage director, during the 1987-1988 season. As executive stage director, PB supervised and made staffing decisions for the Met's stage directing department, which consists of stage directors and assistant stage directors. In her capacity as PB's secretary, plaintiff had only limited contact with defendant David Kneuss, a stage director at that time, but she says he was aloof and generally ignored her. Kneuss is a homosexual male. Plaintiff returned as PB's secretary for the 1988-89 season with the understanding that she would be working at least part of the time for Kneuss. She describes Kneuss during her stint as his secretary as "friendly," "gregarious," and "charming." In any event, to gain experience as an assistant stage director, plaintiff left the Met at the end of the 1988-89 season to work at other theatrical companies outside New York and to study languages in Germany.

In the 1989-90 season, Kneuss assumed many of PB's responsibilities, and at the end of that season he invited plaintiff to return to the Met as an assistant stage director on a production of Der Rosenkavalier scheduled for the 1990-91 season. Plaintiff accepted Kneuss's offer and in the summer of 1990

entered into a "Standard Principal's Contract (Weekly)" with the Met. The contract, signed by defendant Volpe for the Met, provided in pertinent part that plaintiff would work as an assistant stage director for a total of 11 weeks over the course of the 1990-91 season. By the 1990-91 season, Kneuss had become executive stage director. On the infrequent occasions on which they interacted, plaintiff found Kneuss to be cordial, though not quite as "warm" or "gregarious" as in the past. On the whole, however, she described her experience during that season as "positive."

In accordance with the Met's practice of informing its seasonal employees in February of each year whether they will be rehired for the following season, in February 1991, the Met sent plaintiff a letter advising that she would not be rehired for the 1991-92 season. Notwithstanding, Kneuss offered her a position as assistant stage director on a production of The Magic Flute that he was scheduled to direct during the 1991-92 season. Plaintiff then entered into a second "Standard Principal's Contract (Weekly)" with the Met, which was substantially identical to the first.

Plaintiff's problems began during production of The Magic Flute. Kneuss criticized her work and, according to plaintiff, his demeanor toward her changed. Through his "manner of speaking, his tone of voice, the expression on his face, the look in his eye" and his "overall general attitude," Kneuss treated plaintiff daily in a "degrading" and "demeaning" manner. It was also during the 1991-92 season that plaintiff first noticed a set of photographs tacked up on a bulletin board in the assistant stage directors' common office above the desk of SP, an assistant stage director who plaintiff asserts is homosexual. The photographs depicted men in various states of undress.

In February 1992, plaintiff received a letter from the Met offering to renew her contract for the 1992-93 season, and she entered into a third "Standard Principal's Contract (Weekly)," identical to the previous two. Plaintiff says that Kneuss's rude behavior "intensified" during that season, and that she found working for him "depressing and demoralizing." She also continued to take offense at the photographs hanging above SP's desk. In addition, plaintiff complains of a "lewd" conversation she overheard during the 1992-93 season between Kneuss and JF, the artistic administrator of the Met, who plaintiff asserts is homosexual.

In January or early February 1993, Kneuss told plaintiff that he expected assistant stage directors to progress to the

point where they became full stage directors. Plaintiff replied, "I don't know if I want to direct." In February 1993, plaintiff received a letter from the Met informing her that she would not be rehired for the 1993-94 season. Although she met with Kneuss a number of times, she was unable to persuade him to rehire her, and her last day at the Met was April 16, 1993.

■ *The Met's Refusal to Renew Plaintiff's Contract*

Plaintiff claims that defendants refused to renew her contract because of her sexual orientation, i.e., they were motivated by animus against heterosexuals. In accordance with the order and nature of proof as outlined in *McDonnell Douglas Corp. v Green* (411 US 792; *see also, Walsh v Covenant House*, 244 AD2d 214, 215 [the New York City Human Rights Law applies the federal standards for determining employment discrimination claims]), plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing that she was a member of a protected group, that she was qualified for the position she sought, that she was denied the position, and that the circumstances of that denial give rise to an inference of discrimination. Once she makes out a prima facie case, the burden shifts to defendants to articulate some legitimate, nondiscriminatory reason for denying plaintiff the position, after which plaintiff bears the burden of showing that this proffered reason is in fact a pretext (*McDonnell Douglas, supra*).

Plaintiff failed to establish the fourth element of her prima facie case. She contends that the requisite inference of discrimination arises from the fact that the Met replaced her with a person who was not a member of her protected group, i.e., a "presumed homosexual," namely, RG. However, the Federal District Court found that the evidence did not show that RG, in fact, replaced plaintiff as an assistant stage director at the Met (*Brennan*, 1998 US Dist LEXIS 5562 at *25, 1998 WL 193204 at *9), and that finding, with which in any event we are in accord, is binding here (*see, Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65). There also is no evidence that Kneuss, who made the hiring decisions concerning plaintiff and RG, knew the sexual orientation of either of them (*see, Geraci v Moody-Tottrup, Intl.*, 82 F3d 578, 581 ["it is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it is wholly ignorant"]). Plaintiff herself testified that she never discussed her sexual orientation with Kneuss. RG testified that she never discussed her sexuality with anyone at the Met. Plaintiff's argument that Kneuss's denial of such knowledge is "suspect" in light of other

"outrageously self-serving" testimony that showed him to be incredible does not constitute evidence. Plaintiff has not succeeded in raising an issue of fact on her prima facie case and therefore cannot defeat summary judgment on her discrimination in hiring claim (*Zuckerman v City of New York*, 49 NY2d 557, 562).

Even if plaintiff had raised an issue of fact on her prima facie case, we note that she still could not have defeated summary judgment, because she did not succeed in showing both that Kneuss's proffered reason for deciding not to renew her contract was false and that the real reason was discrimination against heterosexuals (*St. Mary's Honor Ctr. v Hicks*, 509 US 502, 515). There is no dispute that Kneuss's stated reasons for not rehiring plaintiff were not discriminatory. He was critical of her work and of her ambivalence about advancing to stage director, a progression that Kneuss expected of all assistant stage directors.

Plaintiff disputes the truth of Kneuss's criticisms on the basis of her own assessment of her performance and cites alleged inconsistencies in Kneuss's behavior. For example, she points out that Kneuss described her once in a memo as "compulsively organized," while he said on another occasion that her organizational skills were "poor." As the Federal District Court found, it is clear from the context of the memo that Kneuss was criticizing plaintiff for excessive organization, which rendered her "production books [ ] unusable because they have not[h]ing to do with actually 'directing' a piece" (*Brennan*, 1998 US Dist LEXIS 5562 at \*29, 1998 WL 193204 at \*10 [quoting Kneuss's memo]). Nevertheless, the court found that plaintiff had raised an issue of fact, if just barely, as to the truth of Kneuss's criticisms (*id.* at \*29-30, at \*10-11), and this finding too is binding here (*see, Schwartz, supra*, 24 NY2d 65).

However, to show that Kneuss used these criticisms as a pretext to discriminate against her, plaintiff must produce evidence to overcome the effect of Kneuss's having made both the decision to hire her and the decision not to rehire her, which "strongly suggest[s] that invidious discrimination was unlikely" (*see, Grady v Affiliated Cent.*, 130 F3d 553, 560, *cert denied* 525 US 936). (Although plaintiff claims that PB compelled Kneuss to hire her, both Kneuss and PB denied this in their depositions. Moreover, the District Court found that it was Kneuss and not PB who made both decisions, and that finding is binding here as well.) Plaintiff states that CM, a heterosexual, was

not rehired, and that RW, a fellow Met employee and plaintiff's confidante, suspected that CM was discriminated against because he was heterosexual. She scoffs at Kneuss's criticisms of CM's work, but offers no evidence with which to challenge them. She states that DS, a perceived homosexual, was hired despite being underqualified. However, after his first season, DS was not rehired, because of performance deficiencies. These facts and unsubstantiated suspicions do not support plaintiff's claim that Kneuss replaced "experienced, highly qualified, perceived heterosexuals" with "inexperienced, under-qualified, perceived homosexuals." Thus, plaintiff failed to overcome the "strong inference" against discriminatory animus to which Kneuss is entitled, having made both the decision to hire her and the decision not to rehire her (see, id., quoting Proud v Stone, 945 F2d 796, 797).

*The Hostile Work Environment Claim*

■ To prevail on her claim of a hostile work environment, plaintiff must show that she was subjected to harassment based on her sexual orientation and that the harassment was so severe or pervasive as to "alter the conditions of [her] employment and create an abusive working environment" (*Meritor Sav. Bank v Vinson*, 477 US 57, 67, quoting *Henson v City of Dundee*, 682 F2d 897, 904). Whether an environment "would reasonably be perceived, and is perceived, as hostile or abusive * * * is not, and by its nature cannot be, a mathematically precise test" (*Harris v Forklift Sys.*, 510 US 17, 22). It can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether it unreasonably interfered with plaintiff's work performance (*id.* at 23). Plaintiff alleges that her work environment was rendered abusive by Kneuss's openly hostile treatment of her, the display of "lewd" photographs of men and the exchange of explicit banter about homosexual sex. She states, "There was no time or place at the Met where I could escape from the hostility and discrimination. I endured unceasing psychological abuse from Kneuss. I never knew when to expect Kneuss to insult me to my face, to demean me in front of others, to witness Kneuss abusing other heterosexuals, to observe Kneuss favoring homosexuals, to hear an offensive, explicit description of an act of bestiality with hamsters from SP, to witness crude banter and gestures from JF." The result was, "I was reduced by Kneuss to a permanent state of emotional and psychological

distress to which my homosexual colleagues were immune. Kneuss's treatment of me prevented me from having access to Kneuss on the same level that was possible for homosexual members of the department. * * * It destroyed any possibility of my working to my full potential." Initially, we consider individually each of the three elements plaintiff identified.

*Kneuss's Demeanor*

Plaintiff described Kneuss's treatment of her generally as "hostile," "degrading," "demeaning," "derogatory," "mean, nasty, and cruel," "rude" and "insulting." She related three incidents in particular. On one occasion Kneuss responded to a series of questions she asked him with a curt yes or no to each, and then told her, "You may go." On another occasion, when she asked him a question, Kneuss rolled his eyes at another Met employee, and on a third occasion, after she introduced him to a visiting orchestra conductor, Kneuss gave her a "nasty" look and told the conductor to "stick with Irene," another Met employee who was sitting next to plaintiff at the time. Reasonable people well might agree that Kneuss's behavior as plaintiff describes it in these incidents was rude or insulting. But there is nothing in the descriptions from which a jury reasonably could find that Kneuss's attitude toward plaintiff was based on her sexual orientation.

Plaintiff states that there is no evidence of Kneuss treating homosexuals in this manner and asserts that Kneuss was hostile to other heterosexuals. It is appropriate for plaintiff to offer direct comparative evidence about how Kneuss treated individuals of different sexual orientations in a mixed-orientation workplace (*Oncale v Sundowner Offshore Servs.*, 523 US 75, 80-81). But she has not done that. Her statement that there is no evidence of Kneuss treating homosexuals "in this manner" does not amount to proof that he treated her "in this manner" because she is heterosexual (*see, St. Mary's, supra*, 509 US at 508 [the crusade against plaintiff may have been personally rather than racially motivated]). Indeed, RW testified that Kneuss was caustic and unpleasant to many people. Plaintiff herself attributed Kneuss's demeanor to the example set by Met general manager Joseph Volpe, who "is very demanding" and "doesn't hesitate to be rude about being demanding." She testified that the longer Volpe had been at the Met, the worse Kneuss's hostility had become. She does not allege that Volpe's rudeness was motivated by animus against heterosexuals.

Plaintiff's corollary assertion, that Kneuss was hostile to other heterosexuals, is also not supported by the evidence.

Plaintiff relies on RW's testimony that Kneuss often was unpleasant to "perceived heterosexuals" PM, PMR and LK. But plaintiff herself testified that RW said she was only guessing about these individuals' sexual orientation. More important, there is no evidence that Kneuss knew their sexual orientation, and he testified that he did not. In any event, PM, PMR and LK were deposed, and all of them denied that they had been treated discriminatorily. PM said that he had never seen or heard of any discrimination on any basis at the Met, PMR described her work experience with Kneuss as fine, and LK testified that as a heterosexual female she had not had any problems at the Met. According to RW, she and plaintiff used to speculate about the turnover in personnel that they observed, and they theorized that the people who were leaving either were not young or were married. This is not evidence from which a jury reasonably could find that Kneuss's attitude toward plaintiff was based on her sexual orientation.

*The Photographs*

The photographs, which depict naked or partially clad men, were displayed on a bulletin board above the desk of SP, an assistant stage director who plaintiff asserts is homosexual, in a common room shared by the assistant stage directors, plaintiff included. In one photograph, four naked men appear to be playing "ring-around-the-rosy" at the beach. The genitalia of two of the men are visible. In another, three men in skin-tight bikinis are sitting at the edge of a pool, dangling their legs in the water. The remaining photographs, with the exception of a photograph of two fully dressed Met employees, depict men with bare torsos. Plaintiff never complained to Kneuss about the photographs, but after they had been posted for more than one season, she removed them from the bulletin board while SP was out of the room. She had never complained about the photographs to SP either. When SP proceeded to put them back up, plaintiff said, "[C]ome on, do you really have to have those pictures up on the bulletin board?" She says the photographs offended her "as a woman, and as a heterosexual."

We have no doubt that reasonable people would agree that photographs of naked men do not belong on display in an office at the Met. But there is nothing in the photographs from which a jury reasonably could find that they were offensive to heterosexuals qua heterosexuals. Plaintiff places particular emphasis on the testimony of Joseph Volpe, who she says "admit[ted] himself that the lewd pictures are shocking and should have been taken down." But Volpe's testimony does not

support her theory. While he did say that he found the photograph of the naked men "objectionable" because of the "frontal nudity," not inconsistently, he did not find the photograph of the bikini-clad men objectionable. The point Volpe made repeatedly was that it was "inappropriate" for the entire array of photographs, or indeed any other such personal item, to be "on public display in a place of business." RW also said she was not "deeply offended" by the photographs, only "sort of shocked that they were on a wall in an office." According to plaintiff, RG, whom plaintiff has identified as a "perceived homosexual," told SP that she "particularly resent [it] that you've put my aunt's [one of the Met employees] picture up there with them." Nothing in Volpe's, RW's or RG's testimony reasonably supports the notion that the photographs were offensive to heterosexuals because of their sexual orientation. Moreover, there is no evidence, and it is counterintuitive to suppose, that no homosexual man would be offended by photographs of naked men in his workplace, or that plaintiff would not be offended by a display on an office bulletin board of photographs of naked women or topless women in bikini bottoms or photographs of both men and women, naked or semi-naked.

Indeed, plaintiff herself explained that the reason she was offended is "because I felt David [Kneuss] was giving preferential treatment to [SP] as a homosexual." Plaintiff compares Kneuss's failure to remove SP's "lewd" photographs, thereby allowing "a perceived homosexual" to "have his way," with his reaction to photographs that she and PM, a heterosexual staff stage director, posted.

Initially, since plaintiff alleges that Kneuss made a "decision to allow the [SP] photos to remain displayed," we must address the issue of whether Kneuss knew about the photographs (see, *Matter of State Div. of Human Rights v St. Elizabeth's Hosp.*, 66 NY2d 684, 687 [an employer can be held liable for an employee's discriminatory act only if it in any way encouraged, condoned or approved the act]). Kneuss testified that he did not become aware of the photographs until after plaintiff filed her Equal Employment Opportunity Commission charge (in April 1993). Indeed, plaintiff never complained about them to Kneuss. She relies instead on RW's testimony that RW told Kneuss that another female employee had complained about the photographs, and Kneuss responded, "They are all adults, if they have a problem, they should settle it among themselves." However, RW testified that she did not describe the photo-

graphs to Kneuss and does not know whether he knew what she was talking about. Plaintiff also asserts that Kneuss had "constructive notice" of the photographs because he met with her in March 1993 for about 20 minutes in the assistant stage directors' common room. Plaintiff alleges that he was seated in a chair facing her with the "lewd" photos on the bulletin board above her head. However, there is no evidence to suggest that, even if Kneuss saw the photographs, he associated them with RW's vague message about a complaint, and there is no other evidence that he was aware that anyone found them offensive. Plaintiff admits that she did not take the opportunity during the meeting to direct his attention to the photographs and that the subject did not otherwise arise. Thus, she has failed to raise an issue of fact as to Kneuss's knowledge of SP's allegedly discriminatory act.

We now address the incidents involving plaintiff's photograph and PM's photographs. As secretary to PB and Kneuss, plaintiff sat at a desk in their office. When she taped a snapshot of PB's baby to the window separating her desk from the outer stage directors' office, Kneuss asked her to take it down. When PM displayed a series of photographs of his son on a bulletin board in his office, Kneuss, according to plaintiff, "by his facial expression," "joined in ridicule of them" with another stage director. Plaintiff claims that, by not allowing her to display photographs of PB's baby and by ridiculing PM, a heterosexual, for displaying photographs of his son, while allowing SP, a homosexual, to display his *lewd* photographs (her emphasis), Kneuss was discriminating against heterosexuals.

Kneuss testified that he asked plaintiff to remove the snapshot of PB's baby because he did not want any pictures on the glass partition separating his office and the outer office. Plaintiff does not dispute that there was nothing else on that window. Nor does she contest that Kneuss did not prevent her from posting the snapshot elsewhere or from displaying anything in the assistant stage directors' office after she became an assistant stage director. Kneuss testified that the stage director with whom he was looking at PM's photographs was LK—whom, it must be noted, plaintiff has identified as a "perceived heterosexual"—and that they were joking that the display was "excessive because there must have been thirty or forty pictures on the bulletin board." Nothing in these two incidents supports plaintiff's claim that Kneuss discriminated against heterosexuals.

*The Explicit Conversations*

Plaintiff alleges that once, in her presence, JF, the artistic administrator of the Met and "a perceived homosexual," was "joking around and laughing" and "talking in what I'd call banter, witticisms" to Kneuss. Having discerned "sexual content" in the first few sentences, plaintiff covered her ears. But she uncovered them in time to see JF pointing to his crotch and asking, "Do you want to do it now." Plaintiff also alleges that once, in her presence, SP, in conversation with a third person, used an expression unfamiliar to plaintiff, and plaintiff asked what it meant. SP laughed and said, "Oh, [Martha], you're so innocent. Don't you know that some people use live hamsters during sex?" And he began to describe the act. When plaintiff said, "For crying out loud, [SP], that's disgusting," he stopped talking about it, and he never discussed it with her again.

Initially, we note that, whatever else may be said about these two conversations, they are too few and too minor to have altered the terms and conditions of plaintiff's employment (*Meritor, supra,* 477 US at 67; *see also, Lopez v S.B. Thomas, Inc.,* 831 F2d 1184, 1189 [incidents of harassment must occur "either in concert or with a regularity that can reasonably be termed pervasive"]; *cf., Tomka v Seiler Corp.,* 66 F3d 1295, 1305 ["even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment"]). Moreover, there is evidence that plaintiff herself recognized them as isolated. In a March 1993 letter asking him for a letter of recommendation, plaintiff wrote, "[JF], I can't tell you how much I've appreciated your wonderful sense of humor. So often through the years just seeing you in the hall and exchanging a laugh has given me courage during difficult times. Thank you." Granting plaintiff every favorable inference raised by the fact that this was a request for a recommendation, we find that she has undermined her own claim that she "never knew when to expect * * * to witness crude banter and gestures from [JF]." Similarly, plaintiff testified that she and SP had had a "close working relationship" and frequently socialized when they worked together outside New York for a period, and it was she who asked SP to tell her what he meant by a phrase he used in conversation with another person. We find here too that she has undermined her claim that she "never knew when to expect * * * to hear an offensive, explicit description of an act of bestiality with hamsters from [SP]." In any event, the Met cannot be held liable for SP's conversation, because plaintiff never

complained about it to anyone in authority (*see, Matter of State Div. of Human Rights, supra*).

More important, the evidence of the "lewd" conversations does not support plaintiff's claim that the work environment was hostile to her because of her sexual orientation, because presumably JF's joke would have had the same effect on her if it had been told by a woman or to a heterosexual man, and she would have found a sex act that involved the use of a live animal disgusting even if it occurred between a man and a woman, rather than, as she alleged, between two men.

### The Totality of the Circumstances

Plaintiff argues that the kind of behavior exhibited in JF's telling Kneuss the joke in front of her "set a tone" that signified that "[i]f it was all right for them to indulge in crude homosexual banter, it was all right for others, like [SP], to bring lewd homosexual photos into the work place." Although she testified that the incident involving Kneuss and JF took place during the 1992-93 season and that SP's photographs had been hanging on his bulletin board since some time in 1991—and, in any event, the record reflects only the one incident involving Kneuss and JF and no evidence that SP witnessed it—plaintiff apparently means to suggest that this incident was just one of many involving that kind of behavior, and that that kind of behavior, rampant among the homosexuals in the office, who felt free to be themselves, caused heterosexuals to feel intimidated, embarrassed and subjected to "disadvantageous terms or conditions of employment to which [homosexuals] [were] not exposed" (*Harris, supra*, at 25 [Ginsburg, J., concurring]). Her contention is that the environment at the Met was pervasively and severely anti-heterosexual, exulting in homosexuality in its every manifestation, for instance, SP's homoerotic photographs, and only barely tolerating heterosexuals.

However, plaintiff cannot prove that the environment was hostile to heterosexuals by citing an allegedly anti-heterosexual incident and stating that it could only have occurred in an environment hostile to heterosexuals. Nor may she rely on the allegedly anti-heterosexual tenor of the incident to color a court's or a jury's view of the hostility with which she alleges Kneuss treated her. She must show, and indeed it is the centerpiece of her argument, that Kneuss, the only person she accuses of discriminatory animus, was hostile to her because she is heterosexual, and created an environment hostile to her on that basis. As indicated, plaintiff alleges that Kneuss treated

her and other heterosexuals badly, while treating homosexuals well. However, it is precisely here that her claim fails. The evidence does not show that Kneuss's attitude toward plaintiff, even if properly characterized as hostile (i.e., antagonistic, malicious, unfriendly), was based on her sexual orientation. Therefore, it is not properly characterized as discriminatory under the law.

Plaintiff urges the exercise of that "[c]ommon sense, and an appropriate sensitivity to social context" (*Oncale*, 523 US 75, 82) that enables courts fully to assess a hostile work environment. We have striven to exercise those faculties. But first and foremost is the evidence. And we conclude that plaintiff simply did not adduce sufficient evidence to sustain her claim that Kneuss created an environment hostile to heterosexuals.

Accordingly, the order of the Supreme Court, New York County (Paula Omansky, J.), entered February 23, 2000, which granted defendants' motion for summary judgment dismissing the complaint, should be affirmed, without costs.

NARDELLI, J. P., MAZZARELLI, SAXE and BUCKLEY, JJ., concur.

Order, Supreme Court, New York County, entered February 23, 2000, affirmed, without costs.