[659 NYS2d 447]

YOUTH ACTION HOMES, INC., Petitioner, v STATE DIVISION OF HUMAN RIGHTS, on Complaint of JORGE PALOMBO, Respondent.

First Department, June 26, 1997

---

### APPEARANCES OF COUNSEL

*Robin D. Fessel* of counsel *(Sullivan & Cromwell,* attorneys), for petitioner.

*Rosamond N. Prosterman* of counsel *(Lawrence Kunin,* attorney), for State Division of Human Rights, respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

Youth Action Homes, Inc. (YAH), a not-for-profit corporation, in conjunction with its affiliate, Youth Action Program (YAP), renovates abandoned buildings, thereby providing low-income housing for the homeless and training to its employee trainees, the majority of whom are Hispanic and black. In 1989, YAH began a search for a senior site supervisor for the renovation of 2313 Second Avenue, one of a cluster of five buildings being renovated and the funding for which the City provided. David Calvert, a director of YAH, who had known complainant, an Hispanic of Argentinean nationality, both personally and professionally for a number of years, contacted him about the position. In June 1989, Calvert sent complainant's resumé to Richard Green, a black of Trinidadian nationality, who was YAH's construction manager and the person against whom complainant's allegations of discrimination are principally directed. Calvert's cover note stated that he knew complainant "from way back" and that complainant was "a fine person", who would be a "tremendous addition" to YAH's staff. Green agreed that complainant should be offered the position. Both Calvert and Green, who saw complainant's resumé describing himself as Argentinean, knew at the time that complainant was Hispanic. Despite YAH's enthusiastic efforts to recruit him for the 2313 position, complainant, who was living in New Mexico at the time, declined the offer because he was not convinced that he wanted to return to New York. YAH then offered the position to Peter Xelas, white and of Greek ancestry, who accepted the offer and, despite his far greater experience, received the same salary as had been offered to complainant.

During the summer of 1990, Calvert told complainant that YAH was about to renovate another building, 2311 Second Av-

enue, and would be hiring a senior site supervisor for that project. Complainant expressed interest and was interviewed in early October 1990 by both Calvert and Green. YAH offered complainant, whose experience was in developing low-income housing for the Spanish community, the position without advertising it because, as Calvert put it, "we felt we had a very strong candidate".

Although YAH expected that complainant would begin work on the 2311 project by early December 1990, the State advised YAH in late November that there would be a delay in funding. Complainant was advised of the delay and came to New York anyway. The discovery of a structural problem with the building facade and the delay in funding ultimately delayed the commencement of full-scale work at 2311 for several months. Nevertheless, since complainant had relocated from New Mexico, Calvert and Green decided to have him start on January 2, 1991. In all, complainant worked for YAH for approximately seven weeks until February 21, 1991, during much of which time, because of the delay at the 2311 building, complainant worked at the 2313 building.

Almost from the outset, Calvert became aware of friction between complainant and other YAH employees, which was due, at least in part, according to Calvert, to complainant's dissatisfaction at not having his own building to supervise. For instance, complainant had his difficulties with both Xelas and Jose Tapia, an Hispanic who quit temporarily because he believed that complainant was trying to take over his job. According to Tapia, complainant's problems at YAH had nothing to do with national origin. Rather, they were a result of an attitude that "he knew better than anyone else", even though he was new to the organization. But, by far, the most serious of the problems was the tension between Green and complainant.

In attempting to deal with the problem, Calvert urged the two men to try to work together. He discussed the situation with his supervisor, Sonia Bu, herself an Hispanic and who, at the time, was the highest ranking and highest paid YAH employee. On February 11, 1991, at a "mini-retreat" in which the entire YAH/YAP staff participated, complainant expressed views critical of Green and the organization. In Calvert's opinion, while some of complainant's suggestions were helpful, many of his comments were exaggerated. On February 14th, Calvert held a meeting with Green, Xelas and complainant in an attempt to resolve the tensions that had developed between complainant and the other employees.

On February 19th, all of the trainees and the construction staff, including complainant, were assigned to the cleanup of construction debris. Supervisors were directed to participate because of the onerous nature of the task; in addition, YAH did not want its trainees to feel they were being asked to do work that the supervisors would not do. The cleanup continued on February 20th. While the rest of the construction staff participated, complainant did not. Instead, he worked on plans for a workshop. There is no evidence that he was instructed to spend that particular day preparing a workshop. On the following day, complainant found a memorandum, prepared by Green, on the bulletin board, referring to complainant's failure to participate in the cleanup the day before. In an unmistakable reference to complainant, the memorandum stated, "I could only say 'shame on you', to the other staff personnel, 'Good Show'." An agitated complainant sought out Green, who was meeting with Calvert in Calvert's office. When Green came out of the meeting, complainant confronted him and described the memorandum as a provocation. Calvert read the memorandum and asked Green for an explanation. Green and complainant then engaged in a heated exchange that terminated only when Calvert ordered the two into his office so that the three of them could discuss the matter.

Complainant and Green each had the opportunity to explain his side of the story. After Green left the meeting, Calvert and complainant discussed complainant's problems. Calvert told complainant that he and Green had to work out their problem and that what was required was flexibility on the part of each of them. According to Calvert, although denied by complainant, complainant responded by saying that he was resigning. Calvert told complainant that, in light of the friction between him and Green, his resignation was probably for the best. Calvert offered to help complainant in finding other work. Shortly thereafter, when Bu learned of the argument, she called Calvert, who described the incident and advised Bu that complainant had resigned.

On February 23rd, a Saturday, complainant went to Calvert, and told Calvert that he had decided not to resign. Calvert told complainant that it would be best if he left the program, and that, if he did not resign, he would be terminated. As Calvert explained, since complainant and Green could not work together professionally, one of them had to go. Calvert decided to terminate complainant, even though he believed that Green had contributed to the problem, because Green had a two-year

record of positive performance while complainant was a probationary employee. Calvert wrote Green a stern letter of reprimand, which was placed in his personnel file.

On Monday, February 25th, complainant met with Bu to explain his position. She promised to discuss the matter with Calvert. After doing so and reviewing the history of complainant's employment, Bu agreed that complainant and Green could not work together. She also concluded that there were no other suitable positions for complainant within the organization and approved Calvert's recommendation to terminate complainant's services.

Later that week, complainant called Dorothy Stoneman, the chairperson of YAH's board of directors, to complain about the treatment given him. After speaking to complainant, Stoneman contacted Calvert and Bu as well as Ethel Velez, the chairperson of the personnel committee of YAH's board. Stoneman and Velez decided that complainant should be suspended with pay pending an investigation and so informed complainant. Stoneman and Velez thereafter conducted an investigation, interviewing complainant, Green, Calvert, Bu and Grace Johnson, a YAH employee who had witnessed the argument between complainant and Green. At the conclusion of their investigation, Stoneman and Velez decided to uphold the determination by Calvert and Bu to discharge complainant, whose salary was continued through the end of March 1991. That decision was subsequently upheld by the full board of directors which, at the time, consisted of three Hispanics, three blacks and three whites.

On April 8, 1991, complainant filed a complaint, alleging an unlawful discriminatory practice relating to employment, with the New York State Division of Human Rights (Division). On September 19, 1991, Sara Morales, the Human Rights Specialist who investigated the complaint, submitted a report recommending a finding of no probable cause. Six days later, however, the Regional Director issued a determination finding probable cause. A hearing spanning eight days was thereafter conducted before an Administrative Law Judge (ALJ), who recommended a finding that YAH discriminated against complainant because he is Hispanic and an award of damages, including a $125,000 award for mental anguish and an unquantified award for back pay. The Commissioner struck the award of back pay, finding, as argued, that complainant had not suffered any loss of income and, because the recommendation did not "conform to the evidence" as regards complainant's

claim of mental anguish, reduced that award to $10,000. With respect to the report's finding of unlawful discrimination, however, the Commissioner essentially adopted the ALJ's findings of fact and conclusions of law. YAH thereafter, pursuant to Executive Law § 298, brought this proceeding, transferred to this Court by the Supreme Court, to annul the Division's determination. Since the finding of illegal discrimination based on national origin does not find any support in the record, the Division's order should be annulled and vacated.

Pursuant to Executive Law § 298, the Commissioner's order cannot stand unless it is supported by "sufficient evidence on the record considered as a whole." Thus, there must be "proof within the whole record of such quality and quantity as to generate conviction in and persuade a fair and detached fact finder that, from that proof as a premise, [the] conclusion or ultimate fact may be extracted reasonably—probatively and logically." (*300 Gramatan Ave. Assocs. v State Div. of Human Rights*, 45 NY2d 176, 181.) In the instant matter, the finding of unlawful discrimination was based on two underlying premises: that Green, complainant's immediate supervisor, subjected complainant to disparate treatment because of his national origin and that Green's supervisors knowingly acquiesced in Green's discriminatory conduct. Neither conclusion is supported by substantial evidence.

The Commissioner's determination that the tension between complainant and Green was a result of Green's discriminatory animus towards Hispanics was based solely on conclusions that Green demonstrated a "pattern of hostility toward other Hispanic subordinates" and that Green ridiculed complainant in front of other employees and deliberately interfered with complainant's ability to do his job. With respect to the former, the Commissioner points to Green's relationships with only two subordinates, Cindy Rosa, a YAH secretary, and complainant himself. Needless to say, two instances, even if substantiated, hardly constitute a pattern, especially in light of the fact that YAH's staff is, for the most part, Hispanic and black. Thus, virtually any action taken against an employee, whatever the cause, will affect a member of a protected class. Moreover, even if the record supported a finding of a pattern of hostility toward Hispanic subordinates, such evidence would have no probity in the absence of some evidence that Green treated Hispanics differently from non-Hispanics. There was none.

The only record evidence as to Rosa's view of her relationship with Green is that she did not regard discriminatory

animus on his part as the cause of her difficulties with him. Although Rosa did not testify at the hearing, the Division's investigative report, admitted in evidence, quotes Rosa as saying, "Green does not discriminate against Hispanics." In fact, the Commissioner ignored the ample evidence that Rosa's termination had nothing to do with her national origin. As the record shows, she was discharged for long-standing performance problems, and only after being given numerous verbal and written warnings. Furthermore, Bu testified, without contradiction, that she involved herself in the termination process to insure that Rosa's termination had nothing to do with a February 1991 memorandum Green had sent Rosa threatening to sue her for defamation of character because of a critical remark she had made about him. Moreover, the evidence shows that Rosa was replaced by an Hispanic, whose hiring Green approved.

There is nothing in the findings underlying the conclusions regarding Green's ridicule of complainant and interference with complainant's ability to do his job that demonstrates a discriminatory animus. The Commissioner's conclusion that Green's use of an "anglicized" version of complainant's first name—from "Jorge" to "George" or "Georgie"—evidences an anti-Hispanic animus borders on the frivolous. While we recognize that the patronizing use of one's first name in addressing that person may reflect, in certain circumstances, a discriminatory animus, that is not the case here. Green's use of "George" or "Georgie" in addressing complainant could be due to any number of nondiscriminatory reasons. According to Calvert, a number of the construction site workers referred to complainant as George because of the difficulty, to those untrained in Spanish, in pronouncing "Jorge". In fact, we are told, the ALJ repeatedly mispronounced complainant's name as "Orjay", rather than "Horhay".

Moreover, even if there were evidence to support a finding that Green was motivated by a discriminatory animus against Hispanics, this record is bereft of any evidence that YAH, Green's employer, discriminated against complainant. "An 'employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning or approving it'." (*Matter of State Div. of Human Rights v St. Elizabeth's Hosp.*, 66 NY2d 684, 687, quoting *Matter of Totem Taxi v Human Rights Appeal Bd.*, 65 NY2d 300, 305.) "Condonation * * * contemplates a knowing, after-the-fact forgiveness or acceptance of an offense". (*Supra,* at 687.)

While Calvert was aware of the strained relationship between complainant and Green, there is no evidence that he ever had any reason to suspect that the tension was the product of Green's alleged discriminatory animus. Thus, even if it could be concluded that Green discriminated against complainant because of his national origin, nothing in the record suggests that Calvert knowingly acquiesced in such conduct. In fact, complainant's letter to Calvert, written shortly after the February 21 incident, complaining of Green's treatment of him, in no way intimates that Green was motivated by any anti-Hispanic discrimination. Thus, the record cannot support a finding that Calvert knew or had any reason to know that the bad feelings between complainant and Green were motivated by any unlawful discrimination.

Nor is there any evidence that either Bu or the YAH board of directors knew of any discrimination when they approved of complainant's termination. As with Calvert, complainant does not contend that he told Bu or any of the directors that he thought Green discriminated against him because of his national origin. In a lengthy letter to the board, complainant failed to offer the slightest suggestion that any of his complaints against Green had its basis in Green's discrimination against him because of his national origin. Calvert, Bu and Stoneman all testified as to the nondiscriminatory reasons for the termination of complainant's employment. Nothing in the record suggests that these were not the true reasons.

Moreover, the Commissioner's finding of discrimination by YAH is at odds with the overwhelming evidence in the record that YAH is not anti-Hispanic. The decision to hire complainant and the decision to terminate his services were made by the same person, Calvert, who earlier, with Green's agreement, had made strenuous efforts to recruit complainant. As many courts have recognized, there is an inherent implausibility in hiring a member of a protected class and then discriminating against that person on the basis of his or her protected status. As one court noted, in *Tyndall v National Educ. Ctrs.* (31 F3d 209, 215 [4th Cir]), "An employer who intends to discriminate against disabled individuals or holds unfounded assumptions that such persons are not good employees would not be apt to employ disabled persons in the first place." (*See also, Lowe v Hunt Transp.*, 963 F2d 173, 174-175 [8th Cir]; *Rand v CF Indus.*, 42 F3d 1139, 1147 [7th Cir].) Furthermore, as noted, Bu, the highest-ranking and highest-paid YAH employee at the time of complainant's termination, was herself Hispanic.

At the time the YAH board of directors approved complainant's termination, one third of its members were Hispanic. As of June 1991, 61% of the YAH/YAP employees were Hispanic. In April 1993, Hispanics comprised 60% of the work force.

The Commissioner also cited as support for his finding of discrimination "[YAH's] overall record of retaining Hispanic employees at its construction sites", citing the fact that three other Hispanic employees were terminated between December 1990 and December 1991. As the record shows, however, the three employees—Ariel Pizarro, Lydia Martinez and Cindy Rosa—were terminated for legitimate nondiscriminatory reasons.

Calvert had Pizarro, hired as a site supervisor, terminated for fighting with a trainee, at whom Pizarro swung a two-by-four. This was not Pizarro's first termination. Three years earlier, he had been fired after a fight with another site supervisor, a black man, who was also fired. Despite the circumstances of his first termination, Pizarro was recruited back into the organization as a site supervisor because of his background and skills. In fact, in October 1989, Calvert had written a complimentary appraisal of his work in recommending a salary increase.

As already discussed, Rosa was terminated, after numerous warnings, for long-standing performance problems. Rosa's replacement was, as noted, an Hispanic whose hiring Green supported. Martinez was terminated at the conclusion of her probationary period for a variety of legitimate reasons, including neglect of duties and erratic attendance. As with Rosa, copies of Calvert's memorandum to Martinez notifying her of her termination were sent to, among others, Bu and John Rivera, an Hispanic member of the board. In relying on these three terminations to support his conclusion that YAH discriminated against complainant because he is Hispanic, the Commissioner ignored the uncontradicted evidence that these employees were discharged for legitimate, nondiscriminatory reasons.

For this reason, as well as numerous others, little deference should be given to the factual determinations of the Commissioner, who, without material alteration, adopted the ALJ's findings of fact and conclusions of law. As a review of the record reflects, these findings and conclusions are so skewed that they cannot be the product of an even-handed review of the evidence. For instance, the ALJ recommended a $125,000 award for mental anguish—reduced, to be sure, by the Commissioner to $10,000—citing as the sole basis therefor the following snip-

pet of complainant's testimony: "It was really—it was mentally, I was suffer daily. I was—I was came in and saw the letter from Mr. Calvert I told him. I cry, because Green is punishing, discriminating me, and there * * * is no way to stop that." The ALJ also recommended a back pay award, later vacated by the Commissioner, when in fact, the complainant had not suffered any loss of income.

The determination reached here is so bereft of support in the record and so infirm in its failure to grasp the true reasons for complainant's dismissal and the nature of his problems at YAH—that of an employee malcontent, who clearly saw himself as a supervisor and could not accept a subordinate role, a not uncommon phenomenon in the workplace—as to reflect a procomplainant bias. As the record shows, complainant had difficulty dealing with a host of fellow employees of varying ethnic and racial backgrounds. The tensions created were based on conflicting visions and attitudes and not on complainant's national origin.

We take this occasion to note that the Division's function is as much to reject spurious claims of unlawful discrimination, as is the case here, as it is to make the appropriate findings and impose an efficacious sanction where there is such discrimination. Human Rights Specialist Morales saw this claim for what it was and recommended a finding of no probable cause. Unfortunately, the Regional Director, for whatever reason, saw it otherwise.

Accordingly, the petition brought pursuant to Executive Law § 298, which was transferred to this Court, challenging the determination of the State Division of Human Rights, dated February 15, 1995, finding that petitioner discriminated against the complainant-respondent in his employment on the basis of national origin and awarding him $10,000 in compensatory damages for mental anguish and humiliation, should be granted, on the law, without costs or disbursements, and the determination annulled.

MILONAS, NARDELLI and WILLIAMS, JJ., concur.

Application by petitioner, brought pursuant to Executive Law § 298, granted, on the law, without costs or disbursements, and the determination annulled.