(October 9, 2003)

■ PAULA FORREST, Respondent, v JEWISH GUILD FOR THE BLIND et al., Appellants. [765 NYS2d 326] —Order, Supreme Court, New York County (Walter Tolub, J.), entered August 26, 2002, which denied defendants' motion for summary judgment dismissing the complaint, unanimously reversed, on the law, without costs, the motion granted, and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants-appellants dismissing the complaint.

Plaintiff is an African-American woman who was hired to work at the Jewish Guild for the Blind (the Guild) as a music therapist in 1985, where she remained until 1994. She claims that she was subjected to discriminatory treatment beginning in 1991 until the time of her departure in 1994. For the reasons that follow, we conclude that plaintiff failed to make the necessary evidentiary showing to avoid dismissal of her complaint in the context of a summary judgment motion.

The complaint asserts eight causes of action: the first and second allege race discrimination; the third and fourth allege retaliation; the fifth and sixth allege aiding and abetting by the individual defendants; and the seventh and eighth allege constructive discharge. Each cause of action relies upon both the New York State and New York City Human Rights Laws (*see* Executive Law § 296; Administrative Code of City of NY § 8-107).

The specific assertions supporting plaintiff's claim that she was subjected to race discrimination while employed at the Jewish Guild for the Blind are that: (1) her immediate supervisor and another coworker told her that their program director had called her an "uppity nigger"; (2) her immediate supervisor encouraged other staff members to refer to plaintiff as "our Black American Princess"; (3) her immediate supervisor circled and highlighted her name, and that of another African-American employee, on their posted time sheets; (4) her program director, at a staff meeting, said "why is it necessary

to stroke Blacks to get them to work?"; (5) in a staff meeting, her program director patted a seat next to her while gesturing in a humiliating fashion, and when plaintiff declined to sit there, made an insulting remark; (6) at the same meeting, her program director snatched her writing pad to look at it, then threw it back onto plaintiff's lap, and when plaintiff spoke quietly to another employee, shouted her name and accused her of disrupting meetings; (7) her immediate supervisor required her to sign out for bathroom breaks and coffee breaks, while staff of other races were not required to do so; (8) she alone was required to perform the responsibilities of two separate jobs, music therapist and case manager; (9) in November 1992, she was summarily demoted from music therapist to case manager, while still required to perform the music therapy tasks; (10) unreasonable deadlines and unreasonable changes in procedure were imposed on her alone; (11) she was pressured to alter her vacation schedule to accommodate white coworkers with less seniority; (12) she was treated rudely, harassed and tormented, unfairly reprimanded and targeted for contrived critiques.

In order to consider the merits of defendants' summary judgment motion, we must examine the documents submitted on the motion, which serve here to set out the history of the conflict between plaintiff and the agency. They explain that when plaintiff returned to the agency in August 1991 from an educational leave that she had begun in the spring of 1990, the Guild had been reorganized, so as to bring it into compliance with the policies of the New York State Office of Mental Health. In order to continue receiving state funding, the Guild had created new departments and implemented various new procedures. Its Continuing Treatment Program was no longer included within its Educational Services Department, but was now part of the agency's Department of Mental Health Services and was renamed the Continuing Day Treatment Program. Plaintiff's position, which had been called music therapist at the time she began her leave, was retitled creative arts therapist by the time she returned, and she was assigned to the Continuing Day Treatment Program, headed by her program supervisor, defendant Eugenia Adlivankina, who was overseen by the head of the Department of Mental Health Services, defendant Goldie Dersh. The job description for the new creative arts therapist position was somewhat broader than that of the former music therapist position: it contemplated a cooperative, interdisciplinary approach by staff, using a combination of music, dance and art, and specific requirements of record-keeping and documentation were imposed.

The newly implemented documentation requirements included making regular sequential progress notes in each client's chart. The Guild asserts that plaintiff had ongoing problems performing this new aspect of her job, resulting in numerous meetings, criticisms and warnings focused on plaintiff's poor medical chart documentation. In support of this assertion, they submit six written warnings to the plaintiff regarding her failure to comport with the job's charting requirements. Other documents, including memoranda from plaintiff to her supervisors, to her union delegate or to her file, further illustrate the nature of the conflicts between plaintiff and her supervisors. In numerous complaints plaintiff asserted that her supervisors were inappropriately burdening her and harassing her, and treating her differently from the other staff members, who were social workers.

The documents illustrating the ongoing problems begin with a handwritten memorandum by plaintiff dated November 12, 1991, directed to "File/Delegate 1199," in which, just a few months after she returned from her leave, she documented her concerns regarding the plans her program supervisor, defendant Eugenia Adlivankina, had discussed in a meeting of the program staff on that date. The memo describes that Ms. Adlivankina explained to plaintiff and the two social workers employed by the Continuing Day Treatment Program that because the program was understaffed and the social workers overloaded, they were planning to assign plaintiff a caseload, clients for whom she would be responsible to provide services such as meeting with the clients' families, making referrals to other needed services, conducting individual therapy sessions and maintaining medical charts. Plaintiff pointed out that these responsibilities were normally assigned to social workers and were beyond the responsibilities set forth in her job description. Plaintiff's supervisor replied that her current job description would be evaluated to determine whether it should be revised. It appears that a certain amount of these plans came to pass; indeed, plaintiff's position was renamed "Case Manager" as of January 1992.

Grievances filed by plaintiff on July 9, 1992 and July 22, 1992 asserted "harassment" without any explanation of the nature of the conduct; the remedy sought was "reimbursement for mailgram and written apology." Another grievance, filed October 8, 1992, challenged the modification of plaintiff's job duties, and sought an adjustment of wages commensurate with her added responsibilities. According to plaintiff, this was never finally resolved after she rejected the Guild's attempt to settle it.

The ongoing major conflict regarding plaintiff's notations on patient charts was first memorialized in a writing dated September 25, 1992, from Ms. Adlivankina to plaintiff. It discussed plaintiff's failure to properly transfer the charts of the five clients whose cases were now assigned to her, and to complete the required biweekly notes on the charts of numerous other listed clients. The memo announced that plaintiff would be "taken off the clinical services except for two groups on Tuesdays and Thursdays" so she could dedicate the rest of her workdays to completing these tasks by October 13, 1992.

A follow-up "Documented Verbal Warning" to plaintiff from defendant Goldie Dersh, the agency's director of mental health services, dated November 3, 1992, discussed further complaints regarding plaintiff's "charting" deficiencies. This memo reviewed the contents of the September 25 memo and added that on October 9, 1992, Ms. Adlivankina made another chart review and identified for plaintiff those aspects of the chart notes that were incomplete or incorrectly completed. This November 3 memo went on to report that Ms. Dersh had reviewed the medical charts from October 19 through October 27, 1992, and found other similar charting deficits by plaintiff, which were also brought to plaintiff's attention by Ms. Adlivankina. Ms. Dersh then stated that despite all these efforts to instruct plaintiff as to the documentation needed on the clients' medical charts, her most recent review on November 2, 1992 revealed that plaintiff's now-completed chart information remained deficient as to the accuracy, clarity and completeness in reporting the dates of patient attendance, and still failed to comply with the requirement that treatment notes be made at exact two-week intervals.

This November 3, 1992 memo went on to explain that plaintiff's failure to properly chart her work with her patients, despite training, supervision and seminars, "places the Continuing Day Treatment Program out of contract compliance with the state regulatory agencies," which could result in "sanctions that may include suspension of licensure, retroactive withdrawal of funding and program closure." The memo further advised of an upcoming Office of Mental Health audit.

A formal written warning was given to plaintiff by Goldie Dersh on November 13, 1992, indicating that plaintiff's "performance of medical chart documentation continue[d] to be problematic and * * * not meet departmental expectations and requirements." This document set out particular aspects of plaintiff's charting that remained deficient, such as the requirement that biweekly notes be made precisely on schedule, every

14 days. It went on to warn that "there is concern about what appears to be a lack of responsiveness on your part to previous guidance and instruction in these matters and what seems to be either an unwillingness or inability to properly perform charting tasks."

Plaintiff filed a grievance dated November 19, 1992, challenging the "verbal warning" of November 3 and the written warning of November 13, 1992 concerning plaintiff's job performance.

A "Second Written Warning" on the same topic by Ms. Dersh, dated December 3, 1992, contained additional complaints as well, including one concerning plaintiff's failure to appropriately note and follow up on patient absences from scheduled groups. On this warning, Ms. Dersh entered a handwritten notation dated December 4, 1992, indicating that plaintiff and her union delegate declined to cosign the second written warning, instead handing Ms. Dersh a grievance report in the nature of a harassment claim. The December 4, 1992 grievance, contained in the record, complained of harassment, without specifying any details.

Another area of conflict between plaintiff and her supervisors is illustrated by a memo dated November 4, 1992, in which plaintiff complained to the agency's personnel director, defendant Carol Handfus, that Ms. Adlivankina had instructed her that she was to take her lunch hour at 12:00 noon rather than at 1:00 P.M. as she preferred; when plaintiff inquired why her coworkers, both social workers, were permitted to choose their preferred lunch hour as long as they were not on duty, her supervisor said they were different because they were social workers.

In yet another memorandum, dated December 23, 1992, Ms. Adlivankina issued a written warning to plaintiff discussing what she viewed as unprofessional conduct, which was reported to have occurred on December 18, 1992. On that date, although plaintiff was scheduled to hold a music therapy group at 1:15, and was therefore scheduled to have her lunch period from 12:00-1:00 P.M., nevertheless she helped serve a holiday lunch to the patients during the 12:00-1:00 period until at 12:20 she was advised that there was sufficient staff and her help was not needed; she then left for lunch. However, at 1:20, Ms. Adlivankina became aware that plaintiff was not with her scheduled music therapy group, so she took charge of the group until plaintiff arrived at 1:35. Furthermore, plaintiff dismissed the group ahead of schedule, at 1:50. Her conduct violated the rules that (1) group sessions were to be at least 45 minutes, (2)

staff members may not shorten a group session without prior authorization, and (3) staff members may not cancel patient service time without first consulting a supervisor.

It is undisputed that as of January 18, 1993, plaintiff voluntarily transferred to another department of the Guild, the Day Treatment Program, operated under the auspices of the New York State Office of Mental Retardation and Developmental Disabilities, which program was coordinated by defendant Pat Finocchiaro. In this position, too, plaintiff was ultimately criticized for failing to maintain patient records as required. Specifically, in March of 1994, plaintiff's new supervisor, Ms. Finocchiaro, sent her a memo documenting "a serious lack of information in the chart," i.e., no monthly notes for a patient who had been in the program for over five months, and no monthly data sheets since the fall of 1993 for other patients, giving plaintiff until April 12, 1994 to correct this problem.

It is also established by the submitted documents that in July of 1994 plaintiff requested a three-month personal leave of absence without pay, to enable her to care for her father in Florida, and that the three-month family medical leave was approved, contingent upon plaintiff submitting "substantiating medical documentation" on or about August 22, 1994. However, plaintiff failed to submit the required medical documentation as to her father's condition, prompting the Guild to send numerous letters to plaintiff's Florida address, with additional Guild certification forms to be filled out by the physician in charge of her father's care. The requests were not answered or acknowledged, except to the extent that, as the Guild subsequently acknowledged in its November 2, 1994 letter to her, on October 18, 1994 it received from her a copy of a form she had filled out for the New York State Unemployment Insurance Division,* in which an individual by the name of J. Mark Cox, on October 7, 1994, merely indicated that her father's diagnosis was "[h]ypertension, aging and prostate," that "medication was indicated as his recommendation for treatment," and that he "needs a family member at home."

On October 28, 1994, the Guild was notified by Federal Express that its most recent letter had been refused and that the courier was advised by D.C. Forrest that plaintiff was not at that address. As a result of a follow-up telephone call by Ms. Handfus to plaintiff's father, the Guild learned that plaintiff left her father three weeks earlier to go to New York, and then

---

* The New York State Department of Labor, upon receipt of this form, determined that plaintiff was eligible to collect unemployment insurance benefits, to be reevaluated in a month's time.

to Hawaii. Nowhere in the record does plaintiff contradict any of these assertions.

By letter dated November 2, 1994, plaintiff was advised that her "employment with the Jewish Guild for the Blind has been terminated due to job abandonment," which letter contained a detailed recitation of plaintiff's failure to properly substantiate the nature of her father's serious illness warranting her family medical leave, as well as her failure to notify the Guild when she was no longer assisting in her father's care, both of which disqualified her from reinstatement to employment.

Meanwhile, plaintiff sent a letter of resignation dated October 22, 1994, which the Guild received on November 4, 1994, which stated, inter alia: "Extenuating circumstances, the most paramount one being the care of my father, has brought me to this juncture in my life. That care is now required beyond the limitations of my leave of absence which the Guild has already granted." The letter expressed gratitude to the Guild for the opportunity it had given her, and made no reference to harassment, retaliation or mistreatment of any kind.

Discussion

At the outset, we agree with the motion court that the three-year statute of limitations was tolled during the pendency of plaintiff's administrative complaint (Administrative Code § 8-502 [d]; *see Acosta v Loews Corp.*, 276 AD2d 214, 217 [2000]; *see also Kordich v Povill*, 244 AD2d 112 [1998]). Accordingly, plaintiff's claims, which would have been timely when the administrative proceeding commenced, i.e., three years prior to September 1994, are not time-barred.

As to the substance of plaintiff's claims, the standard for recovery under section 296 of the Executive Law is in accord with the federal standards under title VII of the Civil Rights Act of 1964 (*see Ferrante v American Lung Assn.*, 90 NY2d 623, 629 [1997]), and the human rights provisions of New York City's Administrative Code mirror the provisions of the Executive Law (*see Acosta v Loews Corp.*, 276 AD2d 214, 219 [2000]). "On a claim of discrimination, plaintiff has the initial burden to prove by a preponderance of the evidence a prima facie case of discrimination" (*Ferrante*, 90 NY2d at 629, citing *Texas Dept. of Community Affairs v Burdine*, 450 US 248, 252-253 [1981]; *McDonnell Douglas Corp. v Green*, 411 US 792, 802 [1973]). A plaintiff claiming employment discrimination must demonstrate: (1) membership in a protected class; (2) that she was qualified to hold the position; (3) termination from employment or other adverse employment action; and (4) that the discharge or other adverse action occurred under circumstances giving

rise to an inference of discrimination (*see Ferrante*, 90 NY2d at 629). "The burden then shifts to the employer 'to rebut the presumption of discrimination by clearly setting forth, through the introduction of admissible evidence, legitimate, independent, and nondiscriminatory reasons to support its employment decision[s]' [citations omitted]" (*id.*). If the defendant's evidence successfully rebuts plaintiff's initial presumption of discrimination, plaintiff may prove that the purportedly legitimate reasons proffered by defendant were merely a pretext for discrimination, by demonstrating that (1) the articulated reasons are false, and (2) discrimination was the real reason (*Ferrante* at 629-630; *McDonnell Douglas Corp. v Green* at 805).

In other words, the defendant can establish a right to summary judgment if it demonstrates that plaintiff lacks evidence establishing each element of the claim, or establishes, without proof to the contrary, that the complained-of conduct, to the extent it is supported by evidence, was prompted by legitimate, nondiscriminatory motives (*Ferrante* at 629).

The question of whether discrimination has occurred most often presents issues of fact, due to the often "devious and subtle" nature of discrimination (*see Ferrante*, at 631, quoting *300 Gramatan Avenue Assoc. v. State Div. of Human Rights*, 45 NY2d 176, 183 [1978]). Yet, summary judgment is appropriate on such a claim where "the defendant ha[s] demonstrated an absence of even a prima facie case, * * * [or] if plaintiff had been unable to raise a question of fact concerning either the falsity of defendant's proffered basis for the termination or that discrimination was more likely the real reason" (*Ferrante v American Lung Assn.*, 90 NY2d 623, 631 [1997]).

Certainly, the allegations of the complaint describe egregious conduct. However, on such a summary judgment motion, once the defendants have made a showing establishing a right to dismissal, the plaintiff's burden in opposing the motion requires more than allegations that, if proven, establish conduct of which we disapprove. The plaintiff must offer evidentiary support not only to establish a prima facie case, but also evidence creating a material dispute of fact as to the showing made by the defendants (*see generally* Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3212:16; *see Friends of Animals v Associated Fur Mfrs.*, 46 NY2d 1065 [1979]; *Stainless, Inc. v Employers Fire Ins. Co.*, 69 AD2d 27 [1979], *affd* 49 NY2d 924 [1980]).

Here, the submitted documentation satisfies defendants' burden on a summary judgment motion of establishing their

entitlement to dismissal of the complaint. They have established a legitimate and nondiscriminatory basis for almost all of the conduct of which plaintiff complains, leaving a remainder of claims that cannot alone serve as the basis for a claim of employment discrimination.

Specifically, when we cull through plaintiff's claims in light of the evidentiary submissions, it becomes apparent that, as defendants point out, many of plaintiff's allegations are unsupported by, or actually disproved by, evidentiary materials, and that the conduct alleged to constitute discriminatory disparate treatment of plaintiff was based upon legitimate and nondiscriminatory reasons, unrelated to any racial animus. In response, plaintiff offers nothing tending to show that the proffered nondiscriminatory explanations are pretextual. All that then remains of plaintiff's claims are the hotly disputed allegations of racial epithets, which are simply insufficient by themselves to support her claim of race discrimination. Ultimately, plaintiff has failed to provide sufficient support to create a question of fact as to whether her termination, or any adverse treatment of her during her employment, "occurred under circumstances giving rise to an inference of * * * discrimination" (*Ferrante* at 629).

The submitted evidence established that, leaving aside for the moment the asserted racial epithets, the complained-of treatment of plaintiff was fully justified by plaintiff's own conduct, unrelated to any racial animus. It establishes the Guild's legitimate reasons for its increase of plaintiff's job responsibilities, and explains the cause of the reprimands, criticisms, and the imposition of deadlines, as charting errors so serious that the agency's state funding could be jeopardized. This showing shifts the burden back to the plaintiff to show that the proffered reasons are, in reality, a pretext for unlawful discrimination.

Defendants' motion also explains why various aspects of plaintiff's claims must be rejected outright in the context of a summary judgment motion. Specifically, the motion papers point out that aspects of plaintiff's complaint lack any support, that some of the factual assertions plaintiff offered to support her complaint fail to establish even a prima facie showing, while others are negated by her own admissions and concessions, and still others are negated by undisputed evidence conclusively establishing the nature of the events and circumstances surrounding her employment at and departure from the Guild.

For instance, some of the complaint's allegations of disparate

treatment are, in essence, suppositions, in that nowhere in the deposition transcripts or other submitted evidentiary materials is it demonstrated that plaintiff has any personal knowledge supporting the claim that non-African-Americans were treated differently than she. These include her unfounded assertions that white staff members did not have to sign out for breaks as she did, were not required to perform any tasks outside their own job description, were not criticized about their work, and encountered no resistance to their requested lunch hours and vacation schedules. In the absence of evidentiary materials demonstrating this aspect of plaintiff's disparate treatment claim, they must be rejected.

Other assertions are contradicted outright by plaintiff herself. Her assertion that she was "demoted" to case manager is belied by her admission at her deposition that in 1992 it was announced that all the members of the professional staff, from social workers to the various "creative arts" therapists, were from then on to be known as "case managers." Her complaint that because of her race she was removed from her office and placed in another with three or four people is explained by her own deposition testimony acknowledging that the program director placed several professionals in one office in the interest of fostering their working together; as Ms. Adlivankina stated in her deposition, plaintiff's desk was placed, along with those of "all of the specialists, creative arts therapy, ceramic person, music therapy person, * * * except maybe for psychiatrists," into one large room "and the purpose was that we would share information about the clients we were treating easily that way." She also admitted at deposition that the reason her supervisor had circled and highlighted her name was because she had arrived late.

Further, much of the conduct which plaintiff characterizes as adverse or discriminatory is benign, such as a lunch hour assignment for noon rather than at 1:00 P.M., or a response to a vacation request in which a supervisor stated that the schedules of others would have to be consulted, or a sign-in requirement that, even if prompted by plaintiff's untimeliness, was imposed on all employees. Her January 1993 transfer was at her own request, and her termination actually followed her voluntary resignation, and in any event resulted from her conduct while on leave.

Aside from the asserted racial epithets, the remaining complained-of actions, to the extent they are not fully explained by the submitted documents, were mild and infrequent, and there is no indication that they were race related in any way.

Plaintiff's claim that Dersh grabbed a notepad out of her hand, then looked at it and threw it down, is not fully explained, but neither is it egregious or race related. The same is true for her protest that Dersh indicated an available seat next to her at a meeting by patting the chair seat, and then scolded her when she declined the indicated seat (by saying she was not a team player).

Turning to the asserted racist remarks, although they could *help* support a claim of a hostile work environment, or a claim that challenged conduct was motivated by a racial animus, when every other claim or challenged conduct has been disproved or otherwise satisfactorily explained, they cannot establish a claim of employment discrimination.

The bias inherent in the reprehensible remarks alleged does not alone satisfy the plaintiff's burden of showing that defendants' explanations for the complained-of conduct are pretextual; yet, she has offered nothing else tending to show that the nondiscriminatory reasons for defendants' conduct toward plaintiff were false or that their conduct toward her was actually motivated by bias (*see Matter of Miller Brewing Co. v State Div. of Human Rights*, 66 NY2d 937, 939 [1985]).

To establish the existence of a racially hostile work environment, a plaintiff must demonstrate " 'more than a few isolated incidents of racial enmity [citation omitted]' " (*Francis v Chemical Banking Corp.*, 62 F Supp 2d 948, 958 [1999], *affd* 213 F3d 626 [2000], *cert denied* 532 US 949 [2001]). Occasional racist remarks do not suffice, even when one is directed at the plaintiff (*Brown v Coach Stores, Inc.*, 163 F3d 706, 713 [1998]). What is required is harassment sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive. working environment (*see Brennan v Metropolitan Opera Assn.*, 284 AD2d 66, 72 [2001]). Plaintiff's assertions as to what was said do not meet this standard.

Moreover, as in *Brown*, plaintiff "also failed to allege that the remarks unreasonably interfered with her job performance" (at 713). In fact, plaintiff makes no specific mention of her job performance at all. Nor does she include affidavits from anyone who heard the remarks, or establish how she was affected other than to state at her deposition that she was "very hurt and very embarrassed" that her colleagues repeated Dersh's alleged comment to her. She says she did not complain to the Guild about the remarks, did not mention them even in her resignation letter, and only specified one such remark in her initial complaint to the New York City Commission on Human Rights, even though all the asserted remarks had allegedly been made prior to that time.

To the limited extent plaintiff's evidence could arguably be taken to demonstrate that she was subjected to *any* treatment different from that accorded to her colleagues, there is nothing showing that any such distinction was related to race, and a strong showing that it was related to dissatisfaction with her attitude and inadequacies in her work.

As this Court stated in *Brennan v Metropolitan Opera Assn.* (284 AD2d 66, 73 [2001]), in dismissing a claim of discrimination on the basis of sexual orientation and a hostile work environment:"It is appropriate for plaintiff to offer direct comparative evidence about how [her supervisor] treated individuals of different sexual orientations in a mixed-orientation workplace [citation omitted]. But she has not done that. Her statement that there is no evidence of [her supervisor] treating homosexuals 'in this manner' does not amount to proof that he treated her 'in this manner' because she is heterosexual." Here, plaintiff similarly failed to show that it was due to her race that she was assigned additional duties and responsibilities, or that it was due to her race that she was chastised for her failures to satisfactorily perform those duties and for her perceived lack of "team spirit." Indeed, there is no showing of any hostility toward other African-American employees; the claimed incident in which the names of plaintiff and another African-American employee were highlighted on a sign-in sheet does not suffice.

Moreover, notwithstanding plaintiff's subjective conclusions that the totality of the defendants' conduct was humiliating, her showing does not satisfy the applicable standard for proving a hostile work environment. In *Harris v Forklift Sys., Inc.* (510 US 17, 23 [1993]), the Supreme Court reaffirmed that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances[, which may] include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." The standard reaffirmed in *Harris* requires "an objectively hostile or abusive work environment—[one] that a reasonable person would find hostile or abusive," as well as the victim's subjective perception that the environment is abusive (*Harris* at 21). The complained-of conduct, such as the requirement of office sharing, the caseload imposed due to reorganization and understaffing, and the exacting demands regarding chart notations, is not such that the reasonable person would find to be abusive. The alleged little contretemps with Ms. Dersh at a meeting

similarly fail to meet the *Harris* standard, being infrequent, mild and unthreatening, particularly in the complete absence of proof that it interfered with plaintiff's work performance.

Indeed, the unreasonableness of plaintiff's reactions to what she perceives to be racially related mistreatment is further illustrated by the tone of her letters to her union representative, the City Commission case representative handling her human rights complaint, the Commission's supervising attorney, and its managing attorney. Her repeated protests in these letters of their "attitude," "insults," "tone," "unwarranted attitude," failure to render "unbiased assistance to all people," and lack of "overall professionalism," illustrate that plaintiff perceives hostility, where a reasonable person would not.

Moreover, although plaintiff did not hesitate to lodge complaints with her union, none of the grievances she made at the time mentioned or alluded to race discrimination, nor did her one complaint to defendant Handfus, in which she asked why social workers were given more freedom to choose their lunch hours than she was. Accordingly, although plaintiff consistently alleged that she was being harassed or treated badly, those complaints and grievances cannot be relied upon to intimate that the Guild was motivated by racial bias (*see Youth Action Homes v State Div. of Human Rights*, 231 AD2d 7, 14 [1997]). To the extent plaintiff now says that the failure to include information in the grievances regarding racial bias was the fault of her union representative, it finds no support in the record.

Plaintiff's claims of retaliation and constructive termination are no more successful than that of race discrimination. To establish prima facie retaliation, plaintiff must show that: (1) she has engaged in a protected activity, (2) her employer was aware of such participation, (3) she suffered from an adverse employment action based upon her activity, and (4) there is a causal connection between the protected activity and the adverse action taken by her employer (*Pace v Ogden Servs. Corp.*, 257 AD2d 101, 104 [1999]; *see Van Zant v KLM Royal Dutch Airlines*, 80 F3d 708, 714 [1996]). Plaintiff has failed to show that she engaged in a protected activity; while an actual complaint to the Guild about disparate treatment due to her race would have been a protected activity, plaintiff's assertion that she made complaints *of discrimination* is not supported by anything in her evidentiary showing. The various complaints she made through her union about her supervisors and their conduct toward her never mentioned the issue of race or racial harassment. Complaints of the kind plaintiff actually made do

not constitute a protected activity, and cannot be the basis of a retaliation claim (see *Castro v New York City Bd. of Educ. Personnel Director.*, 1998 WL 108004, 1998 US Dist LEXIS 2863 [SD NY, Mar. 12, 1998]; *Sitkiewicz v Initial Servs. U.S.A.*, 1999 WL 728643, 1999 US Dist LEXIS 14465 [SD NY, Sept. 17, 1999], *affd* 213 F3d 626 [2000]). Moreover, although plaintiff says she reported a racist remark to her union representative, since she never reported it to the Guild, it cannot serve to support the claim of retaliation by the Guild.

Furthermore, it is unclear what retaliatory adverse employment action she can claim to have suffered, other than treatment due to the reorganization, which affected everyone. Her January 1993 transfer was at her own request. A lunch hour assignment for noon rather than at 1:00 P.M. does not violate the New York Human Rights Law.

Even if we ignored plaintiff's voluntary resignation and accepted her evidence as permitting the inference that her termination was retaliatory, the Guild successfully rebutted any such showing with evidence indicating that plaintiff's termination was based legitimately upon her failure to supply the promised documentation for family leave, her failure to respond to any inquiry regarding her whereabouts, and her ultimate abandonment of the task that formed the basis for her leave.

In any event, plaintiff has "failed to submit sufficient evidence from which a jury could reasonably conclude a causal connection between any protected activity [s]he engaged in and any adverse employment action by the defendant[s]" (*Francis v Chemical Banking Corp.*, 2000 WL 687715, *1, 2000 US App LEXIS 11896, *3 [2d Cir, May 24, 2000] [unpublished op at 213 F3d 626]). Therefore, she has failed to establish a prima facie case on these claims.

Merely determining that "plaintiff has sufficiently pleaded and alleged facts sufficient to substantiate her claims of retaliation," as the motion court did, ignores plaintiff's burden to demonstrate both that the articulated reasons are false, and that defendants' actions were motivated by discrimination (*see Ferrante* at 630).

As to the causes of action against the individual defendants for aiding and abetting, although "an individual may be held liable under Executive Law § 296 (6) and (7) for aiding and abetting discriminatory conduct" (*D'Amico v Commodities Exch.*, 235 AD2d 313, 315 [1997], citing *Peck v Sony Music Corp.*, 221 AD2d 157 [1995]), the aiding and abetting claims here could only survive if plaintiff had successfully raised a

question of fact as to any of the discrimination claims. These causes of action must fall with the failure of her underlying claims.

Finally, with regard to the Guild's liability, this Court has held that " 'an "employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning or approving it" ' " (*Youth Action Homes v State Div. of Human Rights*, 231 AD2d 7, 13 [1997] [citations omitted]). Here, notwithstanding the motion court's observation that defendant Handfus received plaintiff's complaints of harassment, that complaint concerned only plaintiff's lunch hour. Plaintiff specifically testified that she did not make any complaints of racial discrimination to anyone at the Guild, other than to her union representative. There is no support in the record for plaintiff's bald assertion, argued for the first time in opposition to defendants' summary judgment motion, that each written complaint to the individually named defendants was accompanied by her oral complaints of racial discrimination. There is simply no evidence that the Guild was even aware of any claim by plaintiff of racial discrimination, much less that it condoned such conduct. Concur—Buckley, P.J., Mazzarelli, Saxe, Williams and Marlow, JJ.